UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

GLOBAL REVOLUTION TV, an unincorporated
association by and through VLADIMIR TEICHBERG
and VICTORIA SOBEL, individually and as the
GLOBAL REVOLUTION TV *de facto* Principals and
Treasurers, JOSHUA BOSS, PETER HARRIS,

2012 CIV. 5086

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs,

-against-

THE CITY OF NEW YORK, MICHAEL
BLOOMBERG, in his official capacity as Mayor of the
City of New York, RAYMOND KELLY,  in his official
capacity as Police Commissioner, JOHN DOHERTY, in
his official capacity as Sanitation Commissioner, JOHN
DOE and RICHARD ROE and other presently
unidentified officials, employees and/or agents of the
City of New York  in their official and individual
capacities

Defendants.
-------------------------------------------------------------------- X

Plaintiffs GLOBAL REVOLUTION TV  ("GRTV") by and through VLADIMIR

TEICHBERG and VICTORIA SOBEL, as its *de facto* treasurers, JOSHUA BOSS and PETER

HARRIS, by their attorneys, STECKLOW COHEN & THOMPSON, as and for their

COMPLAINT against Defendants, allege the following:

## PRELIMINARY STATEMENT

1.     This is a declaratory judgment and civil rights action to vindicate

Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the Constitution of the

United States, 42 U.S.C. § 1983, and the constitution and laws of the State of New York.

Plaintiffs were deprived of their federal and state constitutional and New York State common law rights when police officers of the New York Police Department ("NYPD") and employees of the New York City Department of Sanitation ("DSNY") (together "CITY OF NEW YORK"), acting pursuant to a policy and on the authority of New York City Mayor Michael Bloomberg and under the direction of Commissioners Raymond Kelly and John Doherty, conducted a surprise night time raid of Zuccotti Park, a.k.a. "Liberty Park" (the "Park").

2.       As part of the raid, the CITY OF NEW YORK seized and retained possession of personal property belonging to GRTV, including at least approximately 100 itemized units of electronic equipment ("live streaming equipment") utilized for the purpose of First Amendment activity, namely "live streaming," or contemporaneously broadcasting via internet, expressive activities of Occupy Wall Street ("OWS") and OWS participants. None of the items of live streaming equipment was recovered.  Virtually all of the live streaming equipment that was seized by Defendants was not returned, or was returned in an unusable condition. To this day, GRTV has not been told by the Defendants what happened to the missing live streaming equipment. Upon information and belief, the missing live streaming equipment was destroyed as part of the raid, which was authorized by Defendant Mayor Bloomberg, and executed by Defendants JOHN DOE and RICHARD ROE and others presently unknown to Plaintiffs ("John Doe and Richard Roe *et al.*") in their capacity as officials, employees and /or agents of THE CITY OF NEW YORK, except with respect to their conduct related to Plaintiffs' request for punitive damages as more particularly set forth below.

## JURISDICTION AND VENUE

3.       This action is brought pursuant to 42 U.S.C §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. This Court has

jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1342(3), 1343(3), and 1343(4) as this is a civil action arising under the Constitution of the United States and the laws of the United States. This Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

4.      This Court has jurisdiction over the supplemental claims arising under New York State law pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper for the United Stated District Court for the Southern District of New York pursuant to 28 U.S.C § 1391 (a), (b), and (c) and § 1402(b) because the claims arose in this district.

## DEMAND FOR JURY TRIAL

6.      Plaintiffs demand trial by jury of all issues herein.

## PARTIES

7.      Plaintiff GLOBAL REVOLUTION TV ("GRTV") is an unincorporated association. It brings this action by and through VLADIMIR TEICHBERG and VICTORIA SOBEL, as its *de facto* treasurers. Persons associated with GRTV come from different backgrounds, including those with college and graduate degrees and those without formal schooling, those with jobs and those who were laid off and are otherwise unemployed. These people come from all racial and ethnic groups and have all been a part of the Occupy Wall Street movement, and are contributing to the OWS movement by helping to document the global Occupy movement, from Madrid to Quebec to Mexico City to Zuccotti Park.

8.      A central tenet of the global Occupy movement is, *inter alia*, that the continuing "capture" of government institutions and policies by banks, corporations and extremely rich individuals is related to growing income inequality in the world and is unjust,

3

unacceptable, and must be rectified. OWS has petitioned the government to redress this grievance through demonstrations in various cities in the world, including New York City and other cities throughout the United States.

9.     Plaintiffs, VLADIMIR TEICHBERG, VICTORIA SOBEL, JOSHUA BOSS and PETER HARRIS are and were at all times relevant residents of the City of New York. Each is associated with GRTV, OWS and the live-streaming subcommittee of the OWS Media Working Group.

10.     Defendant CITY OF NEW YORK is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain police and sanitation departments, which act as its agents in the areas of law enforcement and sanitation, respectively.

11.     Defendant MICHAEL BLOOMBERG is the Mayor of the City of New York. The Mayor is the chief executive officer of New York City. As such, he is responsible for the actions and policies of the NYPD and DSNY, and, *inter alia*, the effectiveness and integrity of the City's government operation. Pursuant to the New York City Charter, he must establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility. He is sued in his official capacity.

12.     Defendant RAYMOND KELLY is the NYPD's Commissioner. He is appointed by the Mayor, is the chief executive officer of the NYPD, and, among other duties, is responsible for the actions and policies of the NYPD, and for the execution of all the laws and the rules and regulations of the State, City and the NYPD. He is sued in his official capacity.

13.     Defendant JOHN DOHERTY is the New York City Sanitation Commissioner. He is appointed by the Mayor, is the head of the DSNY, and, among other

duties, is responsible for the functions and operations of the City relating to the cleanliness of the streets and the disposal of waste, and for the execution of all laws, rules, and regulations pertaining to the DSNY.  He is sued in his official capacity.

14.     Defendants JOHN DOE and RICHARD ROE *et al.*, whose identities are presently unknown to Plaintiffs, are and were at all times officials, employees and/or agents of the City of New York.  They are sued in their official capacities and, with respect to the claim for punitive damages, in their individual capacities.

15.     Except as to the actions that form the basis for the claim for punitive damages as to JOHN DOE and RICHARD ROE *et al.*, at all times relevant, the individual defendants JOHN DOE and RICHARD ROE *et al.* were acting under color of state law in the course and scope of their duties and functions as officials, employees and/or agents of the City of New York, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.

## STATEMENT OF FACTS

### Background

16.     Live-stream video technology ("live streaming" or "live-streaming") allows individuals to broadcast videos in real time via the internet to a potentially infinite audience from cellular phone cameras and other cameras connected to cellular or broad-band internet connections.

17.     On information and belief, a common modality of live-streaming is for one or more cameras to be wirelessly connected via a local-area connection to a "broadcast hub," comprised of one or more personal computers connected to a broadband internet connection.

18.     On September 17, 2011, as part of their effort to call attention to their cause, associates of OWS established an encampment in the Park, a privately owned public space

5

9

in Manhattan's Financial District that is bounded by Trinity Place, Liberty Street, Broadway, and Cedar Street.

19.     At the same time, Plaintiff GLOBAL REVOLUTION TV was formed and began to train interested members of the OWS movement on live-streaming techniques.

20.     Prior to the protesters' eviction from the Park on November 15, 2011, which is described below, GRTV was assisting the OWS media working group in training members of the OWS media working group on live streaming techniques, and the related equipment.

21.     GRTV provided and maintained much of the live streaming equipment located in the northeast corner of the Park throughout OWS' presence at the Park.

22.     The live streaming equipment at the Park was maintained by various members of GRTV and the OWS media and live streaming teams.

23.     On October 13, 2011, the General Assembly of OWS granted funds to OCCUPY NYC LIVE STREAMING sub-group of the OWS MEDIA WORKING GROUP ("OccNYCLive") to purchase various pieces of live-streaming equipment.

24.     At or around the same time, GRTV was independently fundraising to purchase various pieces of live-streaming equipment through donations by individuals.

25.     By November 15, 2011, sufficient live streaming equipment to properly equip more than a dozen live-streamers had been obtained by GRTV and OccNYCLive.

26.     On the night of the raid, at least one-hundred (100) separate pieces of live streaming equipment were located in the Park.

27.     Some of the live streaming equipment was purchased by individuals on behalf of GRTV with funds donated by individuals.

28.     Some of the live streaming equipment was purchased by OWS on behalf of OccNYCLive with funds donated by individuals, with this equipment being utilized and held by GRTV.

29.     GRTV utilized both new and used live streaming equipment.

30.     Upon information and belief, all live-streaming equipment was in sufficiently good condition so as to be useable in capturing and transmitting expressive activity as it occurred in and around the Park and at other OWS-related expressive actions.

31.     GRTV used the live-streaming equipment to transmit the expressive activities of OWS and make the OWS message accessible to both persons associated with OWS and the general public.

32.     Prior to the events of November 15, which are described below, GRTV used the live-streaming equipment to transmit information about ongoing activities, future events and activities, and past events and activities of OWS, transmitting the communication and exchange of ideas, and expressive activity, more generally.


**The November 15th Raid and Retrieval of Property Taken on November 15th**

33.     On November 15, 2011, at approximately 1 a.m., associates of the NYPD arrived at the Park and began announcing with a bullhorn and written fliers that OWS protesters occupying the Park must immediately remove all property from the Park and leave the Park on a temporary basis so that it could be cleaned.

34.     In doing so, said associates of the NYPD, including but not limited to one or more Defendants JOHN DOE and RICHARD ROE, were enforcing a policy or custom of Defendant City of New York.

35.     Said policy or custom of Defendant City of New York was adopted and/or promulgated at the discretion of Defendant Mayor Michael Bloomberg.

36.     Said policy or custom of Defendant City of New York was adopted and/or promulgated at the discretion of Defendant Commissioner Raymond Kelly.

37.     Said policy or custom of Defendant City of New York was adopted and/or promulgated in direct contravention of the administrative enactment of Defendant City of New York's City Planning Commission, whose Plaza Standards governing Zuccotti Park state that the Park must be open and available for public use 365 days per year. *See* Zoning Resolution ("ZR"), §37-60 ("Publicly Accessible Open Areas Existing Prior to October 17, 2007"); ZR §37-623 ("Nighttime closings"); ZR §37-727 ("Hours of Access").

38.     ZR §37-727 explicitly states that City Planning Commission authorization for night-time or other closure of a Plaza such as the Park, which is posted as open to the public twenty-four (24) hours per day, can only be granted following a notice and comment period of no less than forty-five (45) days.

39.     On information and belief, Defendants adopted and promulgated the policy or custom of announcing and enforcing a *sua sponte* closure of the Park for the express purpose of evicting OWS from the Park.

40.     On information and belief, Defendants adopted and promulgated the policy or custom of announcing and enforcing a *sua sponte* closure of the Park for the express purpose of retaliating against OWS for its expressive acts in and around the Park.

41.     OWS protesters were by Defendants and other agents of Defendant City of New York told they would be allowed to return when this work was complete.

42. On information and belief, Defendants and other agents of Defendant City of New York had no intention of allowing OWS protesters to return to the Park.

43. The NYPD agents, including but not limited to Defendants, further announced that property OWS protesters failed to remove would be removed and transported to a DSNY garage on 57th Street, where it could be recovered with proper identification.

44. OWS protesters were warned that those who failed to leave the Park or interfered with efforts to remove property from the Park would be subject to arrest.

45. JOSHUA BOSS and VICTORIA SOBEL were inside the Park at this time.

46. JOSHUA BOSS and VICTORIA SOBEL immediately began to pack up the 50-100 pieces of live-streaming equipment for orderly removal from the Park.

## JOSHUA BOSS

47. JOSHUA BOSS spoke to members of the NYPD and explained that he and VICTORIA SOBEL were complying with the orders to vacate, and were in the process of packing up the live-streaming gear then present in the Park.

48. JOSHUA BOSS asked to see a copy of the warrant that authorized the NYPD conduct.

49. JOSHUA BOSS asked to see a copy of the order that authorized the NYPD conduct.

50. JOSHUA BOSS asked to see a copy of any document authorizing the NYPD conduct.

51. Members of the NYPD ignored the request to see the order authorizing the NYPD conduct, and stated in sum and substance to JOSHUA BOSS, "Anything you don't

remove from the park will be taken into custody and transported to the Sanitation Department where it can be picked up."

52.  A few minutes later, JOSHUA BOSS had packed a large container with live-streaming equipment.

53.  JOSHUA BOSS picked up the large container of live-streaming equipment and walked up the stairs on the Eastern Corner of the Park and crossed Broadway, stopping in front of the HSBC bank located at 120 Broadway.

54.  JOSHUA BOSS handed this large container to PETER HARRIS and began to cross Broadway to pick up the next large container of live-streaming equipment.

55.  JOSHUA BOSS crossed Broadway and began to walk towards the stairs on the Eastern Corner of the Park, where he encountered a line of police officers of the NYPD.

56.  JOSHUA BOSS spoke to one particular female officer of the NYPD, stating in sum and substance, "I am seeking to comply with the order to vacate the Park with all of our property.  I was told we would have time to remove our property.  There are thousands of dollars of live-streaming equipment in there."

57.  The NYPD officer responded, in sum and substance, "I need you to go across the street.  The park is now closed.  Anything that is still in the park will be removed and you can pick it up in the morning."

58.  JOSHUA BOSS was then pushed across the street back towards the HSBC bank.

59.  There was no objective reason for the use of any force against JOSHUA BOSS at that time.

10

60.     JOSHUA BOSS continues to request a copy of a warrant authorizing this conduct, but none has been produced to date.

61.     One Defendant Officer John Doe used their baton to physically push JOSHUA BOSS backwards and onto the large container of live-streaming equipment.

62.     There was no objective reason for the use of any force against JOSHUA BOSS at that time.

63.     In using their baton to physically push JOSHUA BOSS backwards and onto the large container of live-streaming equipment, the Defendant Officer John Doe harmed JOSHUA BOSS and ripped his shirt.

**PETER HARRIS**

64.     At the time that the first officers began to make announcements about orders to clear the park, PETER HARRIS was at a meeting of the OWS "Direct Action" working group, at Judson Memorial Church.

65.     At that time, PETER HARRIS received a text message stating that assistance was needed to remove live-streaming equipment from the Park.

66.     PETER HARRIS took a taxi to the Park.

67.     PETER HARRIS was able to enter the park and retrieve some personal belongings he had stored with the GRTV area.

68.     PETER HARRIS began to work with VICTORIA SOBEL and JOSHUA BOSS, to pack up the live-streaming equipment.

69.     PETER HARRIS carried one bin of live-streaming equipment up the stairs at the Eastern corner of the Park and across Broadway, stopping in front of the HSBC Bank at 120 Broadway.

70.     PETER HARRIS tried to go back to the park to continue helping remove the live-streaming property out of the Park, but was stopped by the NYPD.

71.     PETER HARRIS stated, in sum and substance, that he was simply following the NYPD orders to remove the property from the Park.

72.     PETER HARRIS was not given an opportunity to remove any further property or equipment from the Park.

73.     PETER HARRIS observed NYPD officers and other City employees roughly dragging various items of OWS participants property, including but not limited to tents, books, backpacks, medical supplies and electronics, into a large undifferentiated pile in the South-East corner of the Park.

74.     As the property was being piled in the South-East corner of the Park under the statue named *Joie de Vivre*, a steady stream of sanitation trucks arrived and were loaded with various items from this pile of property.

75.     Most of these sanitation trucks were flat-bed trucks, but some were conventional "compactor" garbage trucks.

76.     PETER HARRIS observed various property being loaded into these conventional garbage trucks.

77.     Some or all of these conventional garbage trucks employed their compactors, destroying the loaded property.

78.     PETER HARRIS was shocked to see this flagrant destruction of property.

79.     PETER HARRIS looked around for members of the press.

80.     However, agents of Defendant CITY OF NEW YORK were not allowing members of the press into the area around the Park to document this conduct.

81.     As a member of the GRTV and OWS Live Streaming team, PETER HARRIS began to live-stream what was happening in the Park.

82.     As PETER HARRIS continued to live-stream the events at the Park, he became the focus of some particular Defendant JOHN DOE Police Officers.

83.     One Defendant JOHN DOE Police Officer pushed PETER HARRIS very hard as he was live-streaming.

84.     PETER HARRIS communicated to the Defendant JOHN DOE Police Officer that he was part of the press.

85.     The Defendant JOHN DOE Police Officer then grabbed PETER HARRIS.

86.     The Defendant JOHN DOE Police Officer then threw PETER HARRIS into the street.

87.     PETER HARRIS was engaged in no criminal conduct.

88.     PETER HARRIS was not in possession of contraband.

89.     PETER HARRIS was attempting to document an ongoing police action.

90.     The Defendant JOHN DOE Police Officer then arrested PETER HARRIS.

91.     The Defendant JOHN DOE Police Officer then arrested PETER HARRIS for attempting to document an ongoing police action.

92.     All charges preferred against PETER HARRIS were dismissed.

## VICTORIA SOBEL

93.    At or around the same time, VICTORIA SOBEL was still in the Park packing up further live-streaming equipment and seeking help from other individuals in the Park to carry more property out of the park.

94.    Once VICTORIA SOBEL had fully packed all of the equipment into large bins, she began to seek assistance to move the bins out of the park.

95.    VICTORIA SOBEL was able to find at least one individual who was on the outside of the police line who could carry a bin of live-streaming equipment out of the Park.

96.    VICTORIA SOBEL carried the bin to this person, and then turned to go back the approximately ten feet to the area where the remainder of the live-streaming equipment was packed up and ready to be moved.

97.    At this point, officers of the NYPD had formed a secondary line between where VICTORIA SOBEL had walked to hand off a bin of live-streaming equipment, and the area where the remainder of the live-streaming equipment was packed and ready to be removed from the Park.

98.    NYPD officers refused to allow VICTORIA SOBEL to continue to remove the live-streaming equipment from the park.

99.    NYPD officers told VICTORIA SOBEL that she could not re-enter the park and that the Park was now closed.

100.    VICTORIA SOBEL explained that both she and the officers speaking were still standing in the middle of the Park.

101.    VICTORIA SOBEL explained that she was in fact seeking to comply with the orders of the NYPD and to remove their property from the park.

14

102.    VICTORIA SOBEL asked if one member of the NYPD could walk the ten feet with her back to the area where the live-streaming equipment was packed and ready to be moved.

103.    VICTORIA SOBEL explained that she was not seeking to stay in the park, and that it will take just two minutes to remove all of this expensive live-streaming equipment from the Park.

104.    VICTORIA SOBEL was not allowed to access the remainder of the live-streaming equipment.

### JOSEPH DIAMOND'S DOG, "MURRAY"

105.    JOSEPH DIAMOND had been present in the Park as a member of GRTV with regularity since mid-September.

106.    On November 15, 2011, JOSEPH DIAMOND had traveled to a funeral in Long Island.

107.    JOSEPH DIAMOND had adopted a four-year old sheep dog ("Murray the dog"), that weighed approximately 30 pounds.

108.    While JOSEPH DIAMOND was in Long Island, Murray the dog had stayed in the Park, and was being taken care of by friends of JOSEPH DIAMOND.

109.    At the time that the NYPD had stopped allowing JOSHUA BOSS back into the park, Murray the Dog was still with the live-streaming gear, being watched by VICTORIA SOBEL.

110.    At the time that the NYPD had stopped allowing VICTORIA SOBEL to return to the area where the live-streaming equipment was packed and ready to be moved, Murray the Dog was by himself with the live-streaming gear.

111.    VICTORIA SOBEL informed the NYPD that the dog was terrified by what was happening around them, and that she needed to help Murray the Dog exit the park.

112.    Members of the NYPD would not allow VICTORIA SOBEL to return the ten feet to where the live-streaming equipment and Murray the Dog were located.

113.    Eventually, VICTORIA SOBEL was able to stop an individual on the other side of the police line and have them bring Murray the Dog to VICTORIA SOBEL.

114.    VICTORIA SOBEL was upset and terrified for the well-being of Murray the Dog.

115.    JOSEPH DIAMOND was upset and terrified for the well-being of Murray the Dog.

116.    When the NYPD announced that all property must be removed from the Park, an OWS protester and multiple GRTV members attempted to remove equipment from Zuccotti Park.

117.    However, after each carried some equipment out of the Park, they were not given access to return to the Park to remove additional equipment.

118.    Upon information and belief, Mayor Bloomberg authorized and assumed ultimate responsibility for the raid.

119.    Prior to the raid on November 15, no notice was given to OWS, GRTV or its associates that all the live-streaming equipment would have to be removed from the Park.

120.    Prior to seizing the live-streaming equipment, Defendants did not provide a hearing or any other pre-deprivation procedure.

121.    Upon information and belief, no emergency situation existed at the Park at or about 1:00 a.m. on November 15, 2011.

122.    The presence of the live streaming equipment in the Park on November 15, 2011 did not create an emergency condition that required the immediate removal of the live streaming equipment.

123.    Prior to November 15, 2011, NYPD officers were continually monitoring the condition of the Park, and had the opportunity to observe the live-streaming equipment in Zuccotti Park.

124.    Upon information and belief, members of the NYPD were aware that GRTV and others maintained a large stock of live-streaming equipment in Zuccotti Park.

125.    The NYPD knew or should have known that, under the circumstances on the night of the raid, it would not be possible to remove all of the live-streaming equipment within the time allotted by the Defendants.

126.    Members of the NYPD, including Defendants, deliberately allowed OWS participants an insufficient amount of time to remove their property from the Park.

## GRTV'S UNSUCCESSFUL ATTEMPTS TO RECOVER EQUIPMENT

127.    On November 22, 2011, VICTORIA SOBEL visited the location at 650 W. 56th Street to search for additional property that was not allowed to be removed from the Park, including but not limited to property of GRTV.

128.    VICTORIA SOBEL found none of GRTV's equipment or property at that time.

129.    On some date thereafter, VLADIMIR TEICHBERG, and others associated with OWS and GRTV, went to the 650 West 56th Street DSNY Garage to retrieve the live-streaming equipment that was seized.

130.   VLADIMIR TEICHBERG gave DSNY representatives a listing of the GRTV live-streaming equipment.

131.   DSNY representatives retrieved none of the items that were GRTV's property.

132.   On information and belief, VLADIMIR TEICHBERG was granted access to look for GRTV's equipment, but was unable to locate any of same.

133.   The following live-streaming equipment of GRTV was seized during the raid and never returned or recovered:

Clear HotSpot Wifi Device
Dell Inspiron 1525
Dell Charger
Cannon HV40
Sony MDR-7502 Headphones
9 CELL Battery for DELL Inspiron 1525 1526 1545 Series, 9 Cell Battery Dell Inspiron 1525 GW 240 GW240 G
Dell Inspiron 1525 - Pentium DualCore 230GB HD 3GB RAM
Pink Dell Inspiron 1525 (needs new battery)
Dell Inspiron 1525, Dell Inspiron 1525
10 PhantomBidder.com Credits
Dell Inspiron 1525  Notebook FREE WEBCAM
Dell Inspiron 1525  Notebook
BRAND NEW Logitech C910 Web Cam, BRAND NEW Logitech C910 Web Cam
Logitech C910 Web Cam
Logitech Quickcam Vision Pro For Mac
BP-2L24H Battery for Canon VIXIA HV20 HV30 HG10 DC330
Orig DELL Inspiron 1525 1526 LCD Front Trim Bezel XT981
9 Cell Battery for DELL Inspiron 1525 1526 1545 M911G
DELL MU194 KEYBOARD FOR 1420/1520/1525/M1330/M1530
Western Digital Caviar BlacK 500GB WD5001AALS
Dell Inspiron 1525 Laptop AS IS PARTS
Intel  Mobile T7700 2.4 GHz 4MB  SLAF7
48.4W006.021 DC In Power USB Board for Dell 1525 1526
TESTED INTEL T7700 SLA43  Laptop Notebook CPU Core2DUO
Intel T7700 Core 2 Duo Laptop CPU 2.4GHz 4mb 800 SLAF7
Dell Inspirion 1525
Intel SLA43 SLAF7 Core 2 Duo Mobile T7700 imac CPU
NEW AC Power Adapter for Dell Inspiron 1501 1525 6000

18

DLINK DNS-343 BRAND NEW SEALED FROM BESTBUY FREE SHIP
Dell Inspiron1525  Notebook computer laptop not working
4GB -ELPIDA Laptop Memory PC2-6400s DDR2-800 SODIMM
10 PhantomBidder.com Credits
Original Dell Inspiron 1525 Mouse Click Button PP29L-C
Dell Inspiron 1525  Notebook
Dell Inspiron 1525  Notebook
NEW DELL Inspiron 1525 USB AC DC POWER JACK BOARD PB04
Macbook 13" A1181 OEM Wireless WIFI 802.11n BCM94321MC
Intel Core, Duo CPU T7700 2.4GHz 4M 800MHz SLA43
Battery for DELL Inspiron D608H X284G 1525 1545 1526
Dell Inspiron 1525 Laptop/C2Duo 2.0 GHz/15.4"LCD/DVDRW, Dell Inspiron 1525 Laptop/C2Duo 2.0
GHz/15.4"LCD/DVDRW
2X New 1400mAh Battery For HTC Nexus One G5 Desire G7
New USB Battery Dock Charger For HTC Nexus One G5
CANON VIXIA HV20 3MP HD MINIDV CAMCORDER
Dell inspiron 1525 laptop windows vista  1.86ghz
Dell Inspiron 1525  Notebook Intel(R) Pentium(R) Dual CPU
Canon Vixia HV20 Camcorder - Silver
Dell Inspiron 1525 2GHz Core 2 Duo 3gb WinVista COA DVD-RW 500gb SATA Laptop CPU
Dell Inspiron 1525  Notebook
Dell inspiron 1525 with 4gb
Canon Vixia HV40 Camcorder - Black very limited use
LAPTOP DELL INSPIRON 1525 CORE DUO 2.0 GHZ 2GB MEMORY HDMI OUT GLOSSY 15.4" LCD
Dell Inspiron 1525  Notebook (parts only-No hard drive)
Dell Inspiron 1525  Notebook
Dell Inspiron 1525 Laptop/PDC 1.7 GHz/15"LCD/3GB/160GB
Dell Inspiron 1525  Notebook
4GB (2 X 2GB) DDR2 PC2-6300 800MHZ SODIMM PC2 6400 4 GB
Canon Vixia HV30 Camcorder, HDV MiniDV bundle
Nikon FC E9 - Converter
Intel Core 2 Duo CPU T7700 2.4GHz 4M 800MHz SLAF7
Intel Core 2 Duo CPU T7700 2.4GHz 4M 800MHz SLAF7 PPGA478 PBGA479
Intel Core 2 Duo CPU Processor T7700 2.40/4M/800 SLAF7
Intel Core 2 Duo Mobile Laptop CPU 2.4ghz SLAF7 T7700 4M/800 Socket P
Intel Core 2 Duo CPU T7700 SLA43 2.4 GHz 800 MHz 4 MB PPGA478 PBGA479
Intel Core 2 Duo SLA43 T7700 CPU Processor 2.40G T7700*
Good Canon HV20 High Definition Digital Camcorder
Dry-Erase Weekly Calendar
Livestream Lawn Sign
Black Diamond Apollo Lantern
Black Diamond Spot Head Light
EMS Basic Pad

19

Marino Socks
EMS Divergence Fleece Jacket
EMS Lined Jacket
Big Agnes King Creek 6 Tent
Fleece Blanket
Bath Towels
Marino Socks
Marmot Precip Full Zip Pants
Ice Breaker Men's Pursuit Leggings
Marmot Women's Strato Jacket
Silence and Noise Dress
Silence and Noise Sweater
Big Agnes 0 ° Sleeping Bag
Alite Caterpillar Chair
Raleigh Blue Bicycle
Dry-Erase Weekly Calendar
Livestream Lawn Sign
Plastic Milk Crates
Plastic RubberMaid Storage Bins
Black Diamond Apollo Lantern
Black Diamond Spot Head Light
EMS Basic Pad
Marino Socks
Divergence Fleece Jacket
Lined Jacket
Big Agnes King Creek 6 Tent
Fleece Blanket
Bath Towels
Marino Socks
OWS Radio Equipment
Marmot Precip Full Zip Pants
Ice Breaker Men's Pursuit Leggings
Marmot Women's Strato Jacket
Large Dry Erase Board
Silence and Noise Dress
Silence and Noise Sweater
Big Agnes 0 ° Sleeping Bag
Dell Inspiron 1525 Battery
Cannon BP-2l24H Battery
Plastic Folding Table
Steel Shopping Cart
Xantrex Xpowerpack 1500 Inverter and Battery
Logitech webcam

Monofrotto Monopod series 394
2 Shoe Video Light Bracket
Shotgun Microphone Cannon DM-50
Vidpro LED Light Kit
Space Heater
Energizer External battery Xpal 18000
24x 36 Dry erase board

134. Plaintiffs estimate the value of the above live-streaming equipment to be at least $45,000.

135. Upon information and belief, in the course of conducting the November 15 raid on the Park, officials, employees and/or agents of THE CITY OF NEW YORK destroyed much of the live-streaming equipment that was seized in the raid.

136. Defendants John Doe and Richard Roe *et al.*'s conduct in destroying, facilitating the destruction, or otherwise allowing the destruction of GRTV's live-streaming equipment was reckless and showed a callous indifference to Plaintiffs' federal and state protected rights.

137. As a result of Defendants' conduct, GRTV lost a substantial part of its live-streaming equipment and thereafter, was much more limited in the number of individuals it could train and send out to live-stream expressive speech activities.

138. On February 27, 2012, a notice of claim was served on the Comptroller of the City of New York.

139. On or about March 7, 2012, a letter was received from Edna Lee of the City of New York, Office of the Comptroller informing GRTV that its claim was being disallowed for being served on the City 102 days from November 15, 2012.

140.   On May 14, 2012, GRTV filed an Order to Show Cause, in New York Supreme Court, County of New York, seeking an order pursuant to General Municipal Law 50-e(5) for permission to file a late notice of claim.

141.   On June 20, 2012, the Honorable Barbara Jaffe granted the motion of GRTV and ordered that the late notice of claim should be accepted by the City of New York.

142.   On or around June 26, 2012, a notice of claim was filed with the City of New York.

143.   As a result of Defendant's conduct, GRTV and the OccNYCLive working group lost a substantial part of its live-streaming equipment and was rendered very close to non-functional.

144.   Defendants failed to train and supervise their officials, employees and agents, including Defendants John Doe and Richard Roe, et al., so as to prevent the seizure and destruction of Plaintiff's property, which resulted in the violation of the First, Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C.§1983, and the Consitituion and laws of New York State.

145.   Defendants' failure to train and supervise amounts to deliberate indifference to the rights of persons with whom Defendants came into contact, including Plaintiffs.

146.   The deficiency in the training and supervision of Defendant John Doe and Richard Roe, *et al*, was an actual cause of the deprivation of Plaintiffs' rights and injuries.

147.   In taking the actions described above, the Defendants were acting under color of state law.

## FIRST CLAIM FOR RELIEF

## (VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES)

148.   Plaintiffs repeat and reallege each and every allegation set forth above.

149.   Defendants' seizure of GRTV's live-streaming equipment constitutes an unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983. These actions were taken pursuant to a policy, and the decision to take such actions was made by high ranking officials of the City of New York.

150.   Defendants' seizure, destruction and failure to return or return in a usable condition GRTV's live-streaming equipment constitutes an unreasonable seizure in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

151.   These actions were taken pursuant to a policy, and the decision to take such actions was made by high ranking officials of the City of New York.

152.   As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

## (VIOLATION OF FOURTHEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)

153.   Plaintiffs repeat and reallege each and every allegation set forth above.

154.   Plaintiffs have a property right in the GRTV live-streaming equipment.

155.   Defendants' actions in (i) failing to provide a hearing or any other pre-deprivation procedure prior to seizing the live-streaming equipment and/or (ii) permitting GRTV's and OWS's associates an unreasonably short deadline to vacate the Park with all their

23

possessions deprived GRTV and OWS of its property without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983. These actions were taken pursuant to a policy, and the decision to take such actions was made by high ranking officials of the City of New York.

156.    Additionally, Defendants' actions in failing to return all of GRTV's live-streaming equipment or in failing to return the live-streaming equipment in a usable condition deprived Plaintiffs of their property without due process of law in violation of Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983.

157.    As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

## (VIOLATION OF THE FIRST AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)

158.    Plaintiffs repeat and reallege each and every allegation set forth above.

159.    In seizing, destroying and/or not returning GRTV's live-streaming equipment, Defendants destroyed OWS's medium for publishing its message, activities and the exchange of ideas, and otherwise interfered with the effectiveness of GRTV to help publicize the message of OWS.

160.    In arresting Plaintiff PETER HARRIS in the absence of probable cause for attempting to document a police action, Defendants violated PETER HARRIS' rights as a citizen journalist.

161.    Defendants actions were undertaken in response to the expressive activities and speech of Plaintiffs.

162. The GRTV live-streaming equipment presented no danger to the Defendants or to the public that necessitated the removal and then destruction and/or failure to return the live-streaming equipment.

163. Defendants did not use the requisite care in seizing the live-streaming equipment and taking possession of the GRTV live-streaming equipment, or in ensuring their return.

164. Accordingly, Defendants acted with a reckless and callous indifference to Plaintiffs' rights under the First Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

165. As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## (VIOLATION OF THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES)

166. Plaintiffs repeat and reallege each and every allegation set forth above.

167. Defendants violated the Fourth Amendment rights of Plaintiffs JOSHUA BOSS and PETER HARRIS through applications of excessive force.

168. No objectively reasonable justification existed for the Defendants' applications of force against Plaintiffs JOSHUA BOSS and PETER HARRIS.

169. Defendants also violated the Fourth Amendment rights of Plaintiff PETER HARRIS by arresting PETER HARRIS in the absence of probable cause.

170. Defendants also violated the Fourth Amendment rights of Plaintiff PETER HARRIS by initiating a prosecution against PETER HARRIS in the absence of probable cause and with malice, that terminated in favor of PETER HARRIS.

171. Plaintiffs JOSHUA BOSS and PETER HARRIS suffered pain, fear, suffering, embarrassment, humiliation, and injuries as a result of Defendants' acts.

172. As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

## (INADEQUATE SUPERVISION AND TRAINING)

173. Plaintiffs repeat and reallege each and every allegation set forth above.

174. Defendants had a duty to train and supervise their officials, employees and agents, including John Doe and Richard Roe, *et al*, so as to prevent the arbitrary and unjustified seizure and destruction of the property of persons and entities such as Plaintiffs.

175. Defendants had a duty to train and supervise their officials, employees and agents, including John Doe and Richard Roe, *et al*, so as to prevent arbitrary and unjustified seizures of persons such as Plaintiffs JOSHUA BOSS and PETER HARRIS.

176. Defendants failed to train and supervise their officials, employees and agents, including John Doe and Richard Roe, *et al*, so as to prevent the seizure and destruction of Plaintiff's property, which resulted in the violation of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983.

177. Defendants failed to train and supervise their officials, employees and agents, including John Doe and Richard Roe, *et al*, so as to prevent the arbitrary and unjustified seizures of persons such as Plaintiffs JOSHUA BOSS and PETER HARRIS.

178. Defendant's failure to train and supervise amounts to deliberate indifference to the rights of persons with whom Defendants came into contact, including Plaintiffs.

179.    The deficiency in the training and supervision of Defendants John Doe and Richard Roe *et al* was an actual cause of the constitutional deprivations and injuries suffered by Plaintiffs.

180.    As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

## (VIOLATION OF ARTICLE 1, SECTION 8 OF THE NEW YORK CONSTITUTION)

181.    Plaintiffs repeat and reallege each and every allegation set forth above.

182.    In the course of the events described above, Defendants violated Plaintiffs' rights under Article 1, Section 8 of the New York State Constitution.

183.    As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

## (VIOLATION OF ARTICLE 1, SECTION 12 OF THE NEW YORK CONSTITUTION)

184.    Plaintiffs repeat and reallege each and every allegation set forth above.

185.    In the course of the events described above, Defendants violated Plaintiffs' rights under Article 1, Section 12 of the New York State Constitution.

186.    As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

## (VIOLATION OF ARTICLE 1, SECTION 6 OF THE NEW YORK CONSTITUTION)

187.    Plaintiffs repeat and reallege each and every allegation set forth above.

188.    In the course of the events described above, Defendants violated Plaintiffs' rights under Article 1, Section 6 of the New York State Constitution.

189.   As a result of these actions, Plaintiffs were damaged in an amount to be determined at trial.

## NINTH CLAIM FOR RELIEF
## (CONVERSION)

190.   Plaintiffs repeat and reallege each and every allegation set forth above.

191.   Plaintiffs have title and/or the right to possess GRTV's live-streaming equipment.

192.   Defendants' actions in seizing the live-streaming equipment and/or failing to return the live-streaming equipment when Plaintiffs requested their return on November 22, 2011 and a second subsequent date, constitutes conversion.

193.   Plaintiffs are damaged as a result of Defendants' actions.

## TENTH CLAIM FOR RELIEF
## (REPLEVIN)

194.   Plaintiffs repeat and reallege each and every allegation set forth above.

195.   The Plaintiffs have title and/or the right to possess GRTV's live-streaming equipment.

196.   Defendants' actions in seizing the live-streaming equipment and/or failing to return them when Plaintiffs requested their return on November 22, 2011 and a subsequent date, is the basis for replevin relief.

## ELEVENTH CLAIM FOR RELIEF
## (NEGLIGENCE)

197.   Plaintiffs repeat and reallege each and every allegation set forth above.

198.    Defendants had a duty to safeguard property seized from individuals and private entities in the course of their official undertakings.

199.    The damage, destruction and/or failure to return Plaintiffs' live-streaming equipment was proximately caused by the negligence, gross negligence, carelessness and/or negligent omissions of Defendants or their officials, employees and/or agents.

200.    As a result of the negligence, gross negligence, carelessness and/or negligent omissions of Defendants, their officials, employees and/or agents, Plaintiffs have sustained monetary damages.

## TWELFTH CLAIM FOR RELIEF

## (NEGLIGENT SUPERVISION AND TRAINING)

201.    Plaintiffs repeat and reallege each and every allegation set forth above.

202.    The City of New York and its officials, employees and/or agents acting within the scope of their employment negligently supervised and trained the individual Defendants, who were unfit for the performance of their duties at the Park on November 15, 2011, thereby causing Plaintiffs to suffer injury, including monetary damages.

203.    Such injuries and damages were foreseeable results of said failure to adequately supervise the individual Defendants.

29

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

1.     A declaratory judgment that Defendants violated Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. § 1983, and Article I, Sections 6, 8, and 12 of the New York State Constitution.

2.     Damages in the amount of at least $45,000 against the City of New York and the individual defendants, jointly and severally, together with interests and costs.

3.     Punitive damages in an amount of at least $1,000 against the individual defendants John Doe and Richard Roe *et al.* who acted in reckless and callous indifference to Plaintiffs' rights as set forth above.

4.     The cost of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

5.     Any further and different relief that this Court deems appropriate.

Dated: New York, New York
        June 26, 2012

Yours, *etc.*

STECKLOW COHEN & THOMPSON

by:

Wylie Stecklow (WS6012)
10 Spring Street, Suite 1
New York, NY 10012
(212) 566-8000
Wylie@WylieLaw.com

*Attorneys for Plaintiffs*

30